Centers for Medicare & Medicaid
Services (CMS)

§
§
§
v.                                          §
§
US NATIONAL HEALTHCARE      §
TRAINING SERVICES               §
Class Action                          §
            Plaintiff                  §

UNITED STATES DISTRICT
Southern District of Texas



**17 CV 0042**

FILED
JAN 09 2017

David J. Bradley, Clerk of Court

### Plaintiff REQUESTFOR
### INJUNCTIVE RELIEF

Plaintiff US National Healthcare Training Services

(USNHTS) and would show the Court as follows to

Defendant Centers for Medicare & Medicaid Services (CMS).

(USNHT) files this  Class Action Petition and Request for

Injunctive Relief complaining of:


1.      On July 12, 2012, The Office of the Inspector General

conducted a investigation on the Centers for Medicare & Medicaid

Services (CMS). CMS requires companies that submit proposals for

ZPIC contracts (offerors) and their subcontractors to (1) disclose

information about any business or contractual relationships that may

present conflicts and (2) provide a strategy to mitigate all conflicts of

interest that may compromise the ZPICs' impartiality in conducting

their work. OIG reviewed conflict-of-interest information for 18

offerors and 85 subcontractors. OIG also conducted a structured

2

interview with CMS staff to determine how CMS addresses conflicts of interest among offerors.  OIG determined whether offerors and subcontractors provided CMS all the information required for their reported conflicts and financial interests.

**2. OIG found out** that offerors and their subcontractors often had business and contractual relationships with CMS and with other offerors, but rarely considered them to be actual conflicts.  They reported having relationships with CMS or contractors of CMS that provide Medicare Parts C and D plans, claims processing, program integrity, and/or quality improvement services. Offerors, subcontractors, and CMS identified 1,919 business and contractual relationships as possible conflicts and 16 as actual conflicts.  CMS does not have a written policy for reviewing conflict and financial interest information submitted by offerors, and submitted information was not always consistent or complete. Specifically, some offerors and subcontractors failed to provide all the requisite information regarding financial interests in other entities.

3. **OIG recommended** to encourage an environment of transparency and accountability among contractors, OIG also recommend that CMS:  (1) provide clearer guidance in the Request for Proposals to offerors and subcontractors regarding which business and contractual relationships should be identified as actual conflicts and which should be identified as possible conflicts; (2) require offerors and subcontractors to distinguish those business and contractual relationships that they deem to be actual conflicts from those they deem to be possible conflicts; (3) state whether offerors and subcontractors need to report

3

income amounts, periods of performance, and types of work performed for their contracts with CMS and income amounts generated from key personnel's other employment; (4) create a standardized format for reporting information in the Organizational Conflict of Interest Certificate and require its use by offerors and subcontractors; and (5) develop a formal, written policy outlining how conflict-of-interest information provided by offerors should be reviewed by CMS staff. CMS partially concurred with OIG first and second recommendations and fully concurred with the remaining recommendations.

**BACKGROUND**

A conflict of interest exists if a Federal contractor is unable or potentially unable to provide impartial assistance or advice to the Government. Conflicts of interest among Federal contractors can compromise the integrity of the contracting process. Federal regulations provide guidance for resolving conflicts among contractors. CMS employs program integrity contractors to identify fraud, waste, and abuse in the Medicare program. ZPICs are of particular importance because they perform the majority of program integrity work for CMS. Therefore, conflicts of interest that affect the impartiality of ZPICs could weaken CMS's efforts to protect Medicare from fraud, waste, and abuse. For example, a program integrity contractor owned by a health insurance company offering a Medicare prescription drug plan might have a disincentive to investigate suspected fraud involving those particular prescription drug plans. Conflicts of interest that go undetected or are not appropriately addressed could cost the Medicare program money and weaken public trust in its services. If ZPICs with conflicts of interest

4

become less vigilant in combating fraud, then taxpayer dollars may be wasted on payments to unscrupulous providers. Situations in which conflicted contractors are unable to conduct their responsibilities impartially could undermine public trust that Medicare is protected from fraud.  As a result, it is important that systems be in place to ensure the independence and integrity of program integrity contractors. In a letter to the Office of Inspector General (OIG), Senators Max Baucus, Thomas R. Carper, and Claire McCaskill raised concerns about potential conflicts of interest among contractors that perform Medicare administrative and program integrity functions.  OIG report was prepared in response to their letter

**The Role of Private Contractors** in Administering Medicare As the agency responsible for administering Medicare, **CMS** employs contractors **ZPIC** to conduct the day-to-day operations of the program, such as claims processing, as well as to conduct program integrity activities designed to fight fraud, waste, and abuse.  Among other responsibilities, program integrity contractors develop and refer suspected cases of fraud to OIG for further investigation. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 substantially changed CMS's Medicare contracting process.  The law requires CMS to award contracts under the FAR, which requires an open, competitive award process. CMS has estimated that the Medicare contracting reform provisions in the law would result in cost savings from increased competition, consolidation of claims processing functions, and reductions in claims error rates.

### The Transition to ZPICs

**CMS created ZPICs** to consolidate all Medicare program integrity functions under one type of contractor in a geographic zone. As of October 2011, ZPICs are replacing Program Safeguard Contractors (PSC) that perform program integrity work in Medicare Parts A and B. At the time ZPICs were established, CMS stated that ZPICs may also assume some of the work of the Medicare Drug Integrity Contractors (MEDIC) that currently perform program integrity activities for Medicare Parts C and D. The new contracting arrangement requires that one ZPIC be assigned to each of seven geographic zones. CMS began to transfer program integrity workloads from the PSCs to ZPICs in 2008. ZPIC contracts for all seven zones have been awarded. ZPICs identify improper billing patterns that indicate potential fraud, waste, and abuse; investigate cases of suspected fraud; and refer cases to OIG for further investigation. The ZPIC Statement of Work details the range of activities that may be required of ZPICs.


### The Contract Award Process for ZPICs

**CMS** begins the contract award process with the release of a Request for Proposal (RFP).4 The RFP outlines CMS's requirements, the nature of the work required, and the contract's period of performance and deliverables. Prospective ZPICs (offerors) compete for contracts by submitting a business proposal, including information about the company's financial status; a technical proposal describing the company's ability to perform the required work; a list of any actual, apparent, or potential conflicts of interest; and a conflict-of-interest and compliance plan that stipulates how the company would resolve any conflicts. A Technical

6

Evaluation Panel evaluates and scores each technical proposal by applying criteria in the RFP.5 Using the panel's rating of each proposal, the CMS contracting officer may establish a "competitive range" that includes the most highly rated proposals. These offerors then have an opportunity to discuss improvements to their proposals with CMS before submitting final revised proposals. Finally, the contracting officer selects a proposal that is determined to provide the "best value" to the Government.

### Conflicts of Interest Among Offerors in the ZPIC Award Process

Requirements for identifying and mitigating of conflicts of interest are provided in both the FAR and the RFP for ZPIC contracts. For example, a conflict of interest exists if a ZPIC is unable or potentially unable to provide impartial assistance or advice to the Government. The Government Accountability Office (GAO) has further clarified the FAR to establish three types of conflicts of interest: An offeror has an "unequal access to information" conflict when, through its work as part of a Government contract, it has access to nonpublic information that may provide the offeror a competitive advantage in a later solicitation for a Government contract. An offeror has a "biased ground rules" conflict when, as part of its performance of a Government contract, it has set the ground rules for another Government contract by, for example, writing a Statement of Work. An offeror has an "impaired objectivity" conflict when its work under a Government contract could involve evaluating itself. The FAR does not require that all contractors be free of conflicts. Contracting officers may award a contract even if

7

an offeror has a conflict of interest that cannot be avoided or mitigated, as long as they establish that an award is in the Government's "best interest." In such a case, a waiver must be requested. However, the RFP explicitly states that contractors should be free of conflicts of interest "to the greatest extent possible."

**Requirements in the ZPIC RFP. The ZPIC RFP includes a number of disclosure requirements designed to identify any conflicts and address them before a contract is awarded. Offerors and their subcontractors must establish a conflict-of-interest program to identify, evaluate, and mitigate all conflicts of interest that prevent, or would appear to prevent, the ZPIC from conducting work in an impartial manner.** The contracting officer assesses the offeror's conflict-of-interest and compliance plan independently of the Technical Evaluation Panel's formal scoring of the **offeror's proposal. The plan assessment is not part of the formal scoring process. The RFP** requires that offerors and their subcontractors disclose any actual, apparent, and potential conflicts of interest by means of an Organizational Conflict of Interest Certificate. The document must include the following items.: (1) A description of all business or contractual relationships or activities that could be viewed as conflicts of interest by a prudent businessperson; (2) a description of the methods to be used to mitigate any conflict; (3) A description of the offeror's program to monitor its own and its subcontractors' compliance with conflict-of-interest requirements; a written affirmation attesting to the accuracy of the information in the certificate;

(4)    A  description of the offeror's corporate and organizational structure;

(5) A accounting of the offeror's financial interests (percentage of ownership in any other entity, income generated from other sources, contracts or arrangements

8

with any insurance organization or its subcontractors, or provider of Medicare- or
Medicaid-reimbursed services);

(6) A list of all of the officers, directors, and managers involved or potentially
involved in the contract with a description of their potential conflicts of interest
and financial interests (officers, directors, and mangers are hereafter referred to as
"key personnel");

(7) A list of all subcontractors to be used in the contract. Offerors that are awarded
ZPIC contracts are required under the RFP to submit an Organizational Conflict of
Interest Certificate to the CMS contracting officer annually on October 31.
Although not required by the FAR, CMS performs annual conflict-of-interest
compliance audits for each ZPIC contract.  These compliance audits are for the
period November 1 through October 31 each year.  If any new conflicts are found,
CMS will notify the ZPIC and require the contractor to submit updated
information, which may include an updated Organiza**tional Conflict of Interest
Certificate and/or a revised mitigation strategy, depending on the specific.**

**Conflict-of-Interest Protests During the ZPIC Award Process**

Offerors may file formal protests with GAO if they object to CMS's contracting

decisions. Since the ZPIC award process began, protests have been filed covering

various issues, including conflicts of interest. In two of the sustained protests, the

issue was the level of detail CMS accepted in the offerors' plan to mitigate a

conflict of interest.  According to GAO, CMS awarded contracts for Zones 2 and 5

to AdvanceMed, Inc., without reasonably considering the plan proposed by

AdvanceMed to mitigate its conflicts of interest.    GAO recommended that CMS

reconsider its determination of AdvanceMed's eligibility for awards.  In both

cases, CMS gave AdvanceMed an opportunity to draft a more detailed mitigation

plan.  The contracting officer reviewed the revised plans and approved them which

presented a direct conflict of interest and harmed Home Healthcare and Hospice

agencies because AdvanceMed had the authority to place Home healthcare and

Hospice agencies on payment suspension and vendor hold without giving a

specific reason. AdvanceMed and a number of ZPIC Zone Program Health

Integrity had the same conflict but they were approved by CMS and they place a

number of Home healthcare and Hospice Agencies on payment suspension thus

causing the agencies to close and go out of business. Most of ZPIC Zone Program

Integrity are in direct competition with Home Healthcare and Hospice Agencies

for CMS Medicare and Medicaid funds. ZPIC Zone Program Health Integrity

began sending bogus letters to Home healthcare and Hospice Agencies that stated

they had credible fraud allegations that were false and then proceed to placed the

Home Healthcare and Hospice Agencies on a 180 day payment suspension

10

without giving any evidence of the creditable fraud allegations. When the agency tried to get any information, none was given by ZPIC. After the 180 day time frame was up. ZPIC place them under another 180 day payment suspension and a vendor hold. Again no information was given and when the agency did receive any information and they appeal a denial or unfavorable decision was given. **The only recourse the agency had was to appeal to the Administrative Law Judge, (ALJ). The ALJ has a two year back log, thus forcing the Home Healthcare and Hospice Agency to go out of business that caused patients to succumb.**

ZPIC contracts were awarded at the time the investigation began in October 2010: Zones 1, 2, 4, 5, and 7. At the time of **OIG data collection**, ZPIC contracts for Zones 3 and 6 had not yet been awarded.  Data Collection Documentation From CMS. **OIG obtained** the following from CMS copies of the portions of the proposal that dealt specifically with conflicts of interest submitted by each offeror for the five ZPIC zones, including the Organizational Conflict of Interest Certificates submitted by each offeror and each of their subcontractors; and copies of statements, files, analyses, notes, records of conversations and meetings, and correspondence CMS used to review offerors' conflicts of interest. Interview With CMS staff. OIG interviewed relevant CMS staff to determine what procedures CMS uses for identifying and reviewing conflicts of interest among ZPIC offerors. Data Analysis A total of 19 offerors submitted proposals for ZPIC contracts in Zones 1, 2, 4, 5, and 7. CMS provided Organizational Conflict of Interest Certificates for 18 of the 19 offerors.

**CMS was unable to locate and provide documentation for one offeror in one zone. OIG** reviewed original and, if submitted, revised Organizational Conflict of Interest Certificates for 18 offerors and 85 subcontractors.  Because some companies submitted proposals for ZPIC contracts in more than 1 zone, there were only 12 unique ZPIC offerors. The first finding of this report is based on these 12 unique offerors.  All of the remaining findings are based on the total of 18 offerors. **OIG** reviewed the original and revised Organizational Conflict of Interest Certificates submitted by offerors and their subcontractors to determine whether they met conflict-of-interest disclosure requirements outlined in the RFP. **OIG** also reviewed the certificates to determine the number of conflicts of interest disclosed by the offerors and their subcontractors.   To determine the business and contractual relationships that offerors and subcontractors had with each other and with CMS, **OIG** analyzed the conflict and financial interest information provided in Organizational Conflict of Interest Certificates. **OIG** reviewed documentation generated by offerors, subcontractors, and CMS to quantify and categorize conflicts of interest.  **OIG** categorized those conflicts into two groups: (1) actual conflicts and (2) possible conflicts.

Actual Conflicts. Actual conflicts are situations in which an offeror, a subcontractor, or CMS described a business or contractual relationship as an actual conflict.  To be included in this category, a conflict must not have been described using other terms, such as **"apparent**," **"potential**," or **"perceived**." Possible Conflicts. Possible conflicts are situations in which an offeror, a subcontractor, or CMS described a business or contractual relationship as an

12

apparent, potential, or perceived conflict. No additional information was provided that would designate the business or contractual relationship as an actual conflict. There was also no indication that the business or contractual relationship was not an actual conflict. This category also includes situations in which an offeror identified business or contractual relationships of various types without specifying which were actual or possible conflicts.

**Findings from OIG on CMS, Health Integrity, LLC and ZPIC Program Health Integrity**

**Offerors and their subcontractors often had business and contractual relationships with CMS and with other offerors, but rarely considered them to be actual conflicts**

Ten of the twelve unique offerors described having business or contractual relationships with CMS and/or another offeror at the time proposals were submitted. These 10 offerors reported a total of 31 relationships with CMS or contractors of CMS that provide Medicare Parts C and D plans, claims processing, program integrity, and/or quality improvement services. The three unique offerors that won ZPIC contracts reported having six such relationships. Some of the 10 offerors considered these business and contractual relationships to be actual or possible conflicts, while others characterized them as financial relationships but not conflicts.

**Seven offerors were subsidiaries of health insurance companies that offered Medicare plans.**

Seven offerors were owned by five health insurance companies, which had contracts to provide Medicare Part C and/or D plans. The seven offerors either did not report their relationships to Medicare Parts C and D plan sponsors as actual conflicts hindering their ability to provide impartial assistance to the Government or did not specify that these relationships were actual conflicts. Some offerors stated that their ZPIC program integrity work would occur in a geographic area different from the one where their parent companies offered Medicare Part C and/or D plans. Other offerors contended that separate corporate and governance structures prevented any influence by their parent companies on their objectivity in performing program integrity work under the ZPIC contract. CMS determined that one of these relationships was an actual conflict because the offeror could be called upon to review the services of its parent company.

**Two-thirds of offerors either were Medicare claims processors or had financial ties to claims processors.**

Two offerors were Medicare claims processors and six offerors had parent or sister companies that were claims processors. One of these six offerors had two parent companies that processed Medicare claims. The other five offerors were owned by parent companies that also owned subsidiaries that processed Medicare claims (i.e., the offeror and subsidiary were sister companies).

14

**Offerors, subcontractors, and CMS identified 1,919 business and contractual relationships as possible conflicts and 16 as actual conflicts Actual Conflicts.**

**Offerors, subcontractors, and CMS identified 16 actual conflicts out of 1,935 reported conflicts. CMS considered all 16 as mitigated. Ten of the 16 actual conflicts belonged to offerors and their** subcontractors that were awarded ZPIC contracts. All 16 actual conflicts were "impaired objectivity" conflicts, meaning that the offeror or subcontractor could be in the position of evaluating work performed or associated with its own company. Fourteen of the sixteen actual conflicts involved offerors and subcontractors with business or contractual relationships with Parts C and D plan sponsors. For instance, one offeror's parent company had a contract to offer technology-related implementation and operations work to a company that was a Part D plan sponsor. In another case, an offeror's parent company owned Parts C and D plans operating in all 50 States. Another subcontractor's parent company operated as both Parts C and D plan sponsors in the zone where the offeror submitted its proposal. One conflict involved an offeror whose parent company also owned a company acting as a QIC for CMS. **According to CMS, this created an actual conflict because the** QIC could be called upon to review the work of the offeror. Another actual conflict involved an individual whose spouse worked for a provider in the zone where the ZPIC was to perform work. In a few cases, CMS disagreed with offerors' and subcontractors' own assessments of their conflicts. For example, CMS required that an offeror characterize its ties to a Parts C and D plan sponsor as actual conflicts. In this

15

case, the offeror provided information about the relationships but did not consider them to be actual or possible conflicts.

**Possible Conflicts. Of the 1,935 total conflicts reported, OIG states there were 1,919 were possible conflicts.**

For example, one offeror's parent company also owned a Medicare Administrative Contractor (MAC) that was processing Medicare claims in the same zone where the offeror would be evaluating claims.  The offeror stated that the situation only presented the appearance of a conflict for two reasons:  (1) although ZPICs analyze provider claims that may have been processed by a MAC, they do not evaluate how MACs process those claims; and (2) the company's corporate structure guaranteed its independence. In another case, an offeror disclosed a possible conflict regarding an individual who sat on its board of directors.  This individual's spouse was a vice president at a provider in the same zone where the contractor would be evaluating claims.  This could present a **possible conflict if the offeror evaluated this provider's claims.   A single subcontractor associated with 3 offerors that were awarded ZPIC contracts accounted for 1,231 of the 1,919 possible conflicts in this category. The subcontractor's contractual relationships were characterized differently across the three zones.  In two zones, the subcontractor listed its contracts with providers and health care plans as possible conflicts because the providers and health care plans may come under the scrutiny of the ZPIC.**

Most of these conflicts stemmed from the company's contracts with providers or health insurance plans. Both types of relationships create a possible conflict because ZPICs could review the providers' and health plans' services.

**CMS does not have a written policy for reviewing conflict and financial interest information**
**submitted by offerors, and the submitted information was not always consistent or complete CMS's**
**CMS's process for reviewing conflict and financial interest information is neither outlined in a written policy nor standardized through the use of checklists or other methods.**

According to CMS staff, CMS performs a preliminary review of all the offerors' certificates upon initial receipt to determine whether the requirements in the RFP are met. More detailed reviews of certificates and exchanges are performed on offerors in the competitive range. A final review and exchange are performed before the ZPIC contract is awarded. However, offerors and their subcontractors often failed to provide all the information required by the RFP, even after CMS reviewed the initial submission of certificates.

**Offerors and their subcontractors did not always provide all the required information regarding key personnel's financial interests in other entities**
**The RFP requires that offerors disclose not only the financial interests of the company, but also the financial interests of key personnel. Two offerors and**
17

**twenty-seven subcontractors did not report any information regarding their key personnel's financial interests in other entities even after CMS requested revised Organizational Conflict of Interest**


**OIG examination of CMS's documentation associated with its review of certificates did not reveal documentation showing that CMS conducted a preliminary review of three offerors' and four of their subcontractors' certificates.**

In addition, there was no consistent documentation detailing whether CMS reviewed every business and contractual relationship and financial interest that offerors and subcontractors reported.  CMS also lacked consistent documentation showing whether its determination agreed or disagreed with offerors' and subcontractors' classification of business and contractual relationships as possible conflicts. It is crucial that not only conflict but financial interest information (e.g., percentage of ownership in any other entity, income generated from other sources) be complete because CMS can use this information to identity conflicts of offerors and subcontractors.  For instance, an offeror or a subcontractor may submit financial interest information that it does not report as an actual conflict, but CMS's review of the details of this information may reveal the relationship to be an actual conflict.

Some offerors and their subcontractors did not distinguish between actual and possible conflicts Offerors and subcontractors reported 173 conflicts without specifying whether they were actual or possible conflicts. After reviewing the information provided by offerors and subcontractors, we could not determine

18

which of these were actual conflicts.  For example, some offerors listed several

conflicts under a single heading, such as "actual or apparent conflicts" or "actual,

apparent, or potential," without clarifying which were actual conflicts and which

were apparent.  In contrast, other offerors and subcontractors provided a list of

relationships and clearly indicated which were actual conflicts

Offerors and their subcontractors did not always provide all the required

information regarding their financial interests in other entities.  Another 7 offerors

and 32 subcontractors did not provide all the required information regarding their

financial interests.  Some offerors and subcontractors simply stated whether they

received income from other sources without including the amounts.  Others

provided only partial information regarding their contracts with health insurance

organizations and providers of Medicare- or Medicaid-reimbursed services.  For

those contracts, the RFP requires disclosure of income amount, period of

performance, and type of work performed.  For a number of these offerors and

subcontractors, information was still missing or incomplete even after CMS

requested revised Organizational Conflict of Interest Certificates.   In some cases,

offerors and subcontractors did not seem to interpret the RFP requirements in the

same way.  For example, offerors and subcontractors provided varying levels of

detail on their existing contracts with CMS. Some disclosed all three items that the

RFP required for contracts with health insurers and providers (income amount,

period of performance, and type of work performed).  Other offerors and

subcontractors did not provide all of these details.

19

**The RFP requires that offerors disclose not only the financial interests of the company, but also the financial interests of key personnel.  Two offerors and twenty-seven subcontractors did not report any information regarding their key personnel's financial interests in other entities even after CMS requested revised Organizational Conflict of** Interest.

The RFP requires that offerors disclose not only the financial interests of the company, but also the financial interests of key personnel.  Two offerors and twenty-seven subcontractors did not report any information regarding their key personnel's financial interests in other entities even after CMS requested revised Organizational Conflict of Interest.

Another 14 offerors and 17 subcontractors did not provide all of the required information regarding key personnel's financial interests.  For example, some offerors and subcontractors stated that key personnel were employed elsewhere, but did not provide their income amounts.  Some stated that key personnel held investments, but did not provide the amounts held.   Some offerors seemed to have different interpretations of the scope of these disclosure requirements.  For their key personnel, some offerors and subcontractors addressed only financial interests that they believed presented conflicts. Others addressed all financial interests, regardless of whether they considered them conflicts.

## OIG CONCLUSION AND RECOMMENDATIONS

Because ZPICs perform program integrity functions for CMS, it is crucial that they be free from conflicts of interest that could affect their work. Conflicts of interest could introduce bias, which in turn could influence ZPICs' efforts to reduce fraud, waste, and abuse in the Medicare program. Contractors and CMS have the responsibility to ensure that conflicts are identified and mitigated. According to the ZPIC RFP, offerors and their subcontractors are required to identify their conflicts and their financial interests in other entities. However, some offerors and subcontractors failed to provide all the requisite information regarding financial interests in other entities. Additionally, descriptions of their conflicts of interest the offerors and subcontractors presented were often unclear. Some offerors and subcontractors did not distinguish actual conflicts from possible conflicts. Currently, CMS does not use a written policy or standard checklist to facilitate its review of Organizational Conflict of Interest Certificates. In addition, OIG found no documentation showing that CMS conducted a review of some offerors' and subcontractors' certificates. In some cases, even after CMS had requested revised certificates, required conflict and financial interest information was still missing.

**OIG Recommendation**

1) CMS should state whether offerors and subcontractors need to report income amounts, periods of performance, and types of work performed for their contracts with CMS and income amounts generated from key personnel's other employment. CMS.

2) CMS should create a standardized format for reporting information in the organizational conflict of interest certificate and require its use by offerors and subcontractors

**CMS Response**

CMS concurs with the recommendation. CMS' draft and review policy contains RFP language that standardizes the format for reporting information in the organization conflict of interest certificate.

**OIG Recommendation**

CMS should develop a formal, written policy outlining how organization conflicts of interest certificates are to be reviewed by CMS.

**CMS Response**

CMS concurs with the recommendation. The draft policy includes documentation templates for use by Contracting Officers. In addition, CMS has recently performed extensive training in this area and will continue to educate its staff on how to properly assess, analyze and document OCI matters.

22

**General Comments**

In an effort to provide further clarity as to how CMS addressed ZPIC OCI issues, the following general comments are also provided:

**CMS suggests that the OIG report state that all substantive actual or potential OCI were mitigated for ZPIC awardees to the satisfaction of the Contracting Officer. These conflicts were addressed and mitigated prior to the award.**

In performing OCI analysis, it is important to understand the contract requirements and the roles of the contractor. As background, CMS uses ZPICs to perform program integrity activities designed to fight fraud, waste, and abuse in the Medicare program. In doing so, ZPICs review providers and suppliers (i.e. physician, hospitals, DME suppliers, etc) and their submitted fee-for-service Medicare claims in performing its activities. In traditional fee-for-service, the fraud in which the ZPIC is required to review occurs at the provider level, not at the claims processing level. The ZPIC contract has the potential for ZPICs to also perform program integrity activities associated with Medicare Part C and/or D. Unlike traditional fee-for-service Medicare, where fraud typically occurs at the provider level as indicated above, in Part CID, fraud can occur at the plan level. This distinction is important for OCI analysis because consideration must be given regarding who or what the ZPIC is reviewing.

23

"Offerors and their subcontractors often had business and contractual relationships with CMS and with other offerors, but rarely considered them to be actual conflicts."

As stated in the beginning of this report, CMS has been addressing OCI issues since 1999. We required that ZPIC offerors disclose conflicts so we could make an independent analysis of the specific conflicts, regardless of how offerors characterized such conflicts.

**OIG also mentions of the report that its review of certificates did not reveal documentation of CMS conducting a preliminary review offerors and four of their subcontractors' certificates. CMS would like to clarify that a preliminary or cursory review was conducted; however, no documentation was included in the file as this is not required for offerors not included in the competitive range for award.**

 CMS thanked the OIG for evaluating this important issue and is confident our new OCI

policy will enhance our already rigorous OCI evaluations and determination process.

24

## I  DISCOVERY OF FACTS AND COMPLAINT

Pursuant to the Federal Rules of Civil Procedure 190, USNHTS discovered that **CMS has not followed any of the recommendations from the Office of inspector General investigation of July 2012 thus allowing Health Integrity, LLC to instruct ZPIC Zone Program Health Integrity Contractors thus provoking the filing of this petition, and create addition damages such as:**

1,      To hire and employ unqualified individuals to review Home Healthcare and Hospice claims and assessed payment suspensions, vendor holds, and recoupment of monies.

2.      To send out bogus letters that did not have any substantial evidence documentation of creditable fraud allegations that eventually lead to closing agencies.

3.      To allow agencies to be place on a 180 day payment suspension without giving any factual information. Then after the 180 days were up, give another 180 day payment suspension which led to the closing of the agency.

4.      To allow a false random sampling statistical analysis to investigate agencies which 90% of them were minorities that had a great rating and reputation before the sampling but later was cited with violations from their files and were accused of Medicare fraud.

5/      To allow ZPIC contractors to be in direct conflict when competing for Medicare funds,

6.      To allow large HMO;s such as Blue cross Blue Shield to owned ZPIC  Zone Program Contractors that has put a large number of Home Healthcare and Hospice Agencies out of business with accusations of criminal activity and subsequence FBI investigation that led to no

25

arrest at the agency for years which led the agency to closed and release their patients in which many had succumb.

7.      To falsify and report information and documents o CMS that later led to revocation of license for the agencies that eventually closed their doors and their patient.

8.      To assess millions of dollars of unnecessary fines that did not have any substantial documentation that was evidence of documentation that equal up to the amount of the fine.

9.      To allow staff at the agencies to be dismissed for no funding to the agency.

10.      To allow a great number of agencies to lose billions  of dollars in revenue over a six year period.

*See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 571, *cert. denied*, 459 U.S. 838, 74 L. Ed. 2d 80, 103 S. Ct. 86 (1982); *Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library Inc.,* 586 F.2d 962, 966 (2d Cir. 1978)

## II. PARTIES

USNHTS is a Texas Corporation with its principal place of business at

2626 South Loop West, Suite 426, Houston, Texas 77054.

Centers for Medicare and Medicaid Services (CMS) principal place of business at

7500 Security Blvd, Baltimore, MD 21244 in Baltimore County. Service of process may effectuated upon its Acting Administrator, Andy Slavitt. Service of process may be made by personal delivery or certified mail return receipt requested,

## III  AUTHORITY

The controversy that is the subject of this suit falls within the Court's general authority as USNHTS seeks monetary relief from Centers for Medicare & Medicaid Services (CMS) of **100 billion dollars** to this Court and nonmonetary relief.  USNHTS agencies' damages will increase if CMS continues to allows Health Integrity, LLC Contractors to operate and continue to invoke payment suspensions, vendor holds, recoupment of monies, and send out creditable fraud allegations, false random sampling with the selection of minorities to discriminate against their agencies in order to close their business.

## IV.  REQUEST FOR DISCLOSURE

USNHTS requests that CMS disclose, within 50 days of the service of Plaintiff's Original

Petition, the information or material described in Rule 194.2.


## V.  PRAYER

USNHTS respectfully prays that the Court enter judgment in its favor and against Centers
for Medicare & Medicaid Services (CMS)

on each of its claims, as set forth above.   USNHTS prays for the

following:

(1)     That the Court enter a Temporary Restraining Order

to CMS to stop operating and sending out letters to Home

Healthcare and Hospice Agencies agencies.in 2017.


(2)     A judgment be rendered against CMS for USNHTS' agencies actual damages
resulting from the unlawful conduct described in this petition, exemplary
damages, together with prejudgment interest as provided by law;

(3)     A judgment be rendered against CMS for USNHTS' attorneys' fees; and

(4)     USNHTS agencies recover all costs of court, post-judgment interest, and
such other and further relief, at law or in equity, to which it may be justly

Respectfully Submitted,

Kevin B. Simms


US National Healthcare Training Services
2626 S Loop W. Suite 426
Houston, TX 77054
Phone: (832) 940-2426
Facsimile:
ksimms@usnhts.com

CAUSE NO. ___ __ __

| | | |
|---|---|---|
| Centers for Medicare & Medicaid Services | § | UNITED STATES DISTRICT COUR |
| CMS | § | Southern District of Texas |
|      Defendant | § | |
| | § | |
| v. | § | Federal Court |
| | § | |
| US National Healthcare Training | § | |
| Services | § | |
| (USNHTS | § | |
| | § | |
| | § | JUDICIAL DISTRICT |

Monica Zubia IN SUPPORT OF VERIFIED ORIGINAL
PETITION AND APPLICATION FOR INJUNCTIVE RELIEF

STATE OF TEXAS

County of Harris

§

DEBORAH J. MENDOZA
Notary Public, State of Texas
Comm. Expires 03-10-2018
Notary ID 11149811

Deborah J Mendoza
January 09, 2017
Monica Zubia appeared before
me.

BEFORE ME, the undersigned authority, on this day personally appeared Monica Zubia known to me, and who, being by me first duly sworn, upon oath, deposed and stated as follows:

1.    "My name is Monica Zubia. I am over twenty-one years old, of sound mind, capable of making this statement and personally acquainted with the facts stated in it, which are true and correct.

2.    I am COO of USNHTS and. I have read the foregoing Verified Original Petition and Application for Injunctive Relief (the "Petition"), including all of the factual statements contained in it. Based upon my personal knowledge, all the factual statements contained in the Petition are true and correct.

3.    The correspondence that is attached to the Petition as Exhibits A, are true and correct copies."